UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID BRIAN BINIENDA,

               Petitioner,                     Case Number 09-13233
                                                     Honorable David M. Lawson

v.

DEBRA SCUTT,

               Respondent.

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

      During an altercation in Mt. Clemens, Michigan on April 4, 2006, petitioner David Brian

Binienda used his knife to slash the face of Kevin Valentine from his left ear to his chin. For that

act, Binienda was charged with assault with intent to commit great bodily harm in violation of

Michigan Compiled Laws § 750.84. After a Macomb County, Michigan jury convicted him, the

petitioner was sentenced to a prison term of four to twenty years. He is presently in the custody of

the Michigan Department of Corrections and has filed a *pro se* petition for a writ of habeas corpus

under 28 U.S.C. § 2254, alleging that his trial was unfair for a variety of reasons, including the

ineffectiveness of his lawyers, the prosecutor's misconduct (including the suppression of favorable

evidence), the erroneous admission of evidence (including a statement he made before he was given

his *Miranda* rights), and inaccurate transcripts filed in his direct appeal. The state courts found no

merit in any of these claims, and neither does this Court. Therefore, the petition for writ of habeas

corpus will be denied.

I.

      The slashing of Valentine culminated a series of encounters on that day in April 2006, which

the Michigan Court of Appeals summarized as follows:

Douglas Finkle testified that on April 4, 2006, he was eating lunch at a Salvation Army lunchroom when Binienda walked up behind Finkle and punched him in the back of the head. Finkle said that he had known Binienda for a couple months before the incident and had bought marijuana from Binienda in the past. Finkle claimed that Binienda became angry with Finkle when he stopped buying marijuana after Binienda doubled the price. After Binienda hit him, Finkle finished eating and left the building, but Binienda followed him.

Kenneth Valentine testified that he saw Binienda punch Finkle in the back of the head and followed Binienda out of the building. Valentine asked Binienda not to bother Finkle because he "recently had a stroke and hitting him in the head wasn't the smart thing to do[,]" but Binienda threw a punch at Valentine. Valentine then punched Binienda. Finkle said that Valentine did not have anything in his hand when he punched Binienda and denied that Valentine had a pipe or brass knuckles. Valentine similarly denied that he hit Binienda with anything other than his fist. Finkle, Valentine, and Timothy Roberts then all left in Finkle's Jeep.

The men drove to a convenience store where Finkle bought a twelve pack of beer, and they drank some of the beer in Valentine's driveway. Finkle said that he drank one beer and that Valentine and Roberts each had two or three beers, but on cross-examination, Finkle said that he had drunk two beers. Finkle said that he believed that Roberts had been drinking before Finkle met him.

After drinking, Finkle was driving his Jeep, with Roberts in the passenger seat and Valentine in the back seat, when he decided to check his apartment because Binienda knew where he lived, and he feared that Binienda might break a window or try to break in. When Finkle turned into his apartment complex, he saw Binienda walking through a park across the street from his complex, carrying a yellow bag in one hand and a knife in the other. Finkle further testified as follows:

> [Binienda] ran around the front of my Jeep, and my window was down. And he came up beside the window and he started screaming at me. And then all of the sudden the knife came in and I had my hand on the door handle and I opened it, and I hit him with the door handle. I closed it. I did not close the window. . . . [T]he knife and his fist came in and hit me in the side of the face.

Finkle said that he did not get cut, but he noticed later at the hospital that his hat had been cut.

According to Finkle, Valentine then yelled from the backseat, "You want a piece of me?" Binienda answered, "yes[,]" ran to the back of the Jeep, and Valentine exited the vehicle. Through the rearview mirror, Finkle saw Binienda cut Valentine down the left side of his face. Binienda then ran off. Finkle denied that Valentine had been armed with anything. Valentine testified that he did not notice a knife when

Binienda reached into the Jeep.  Valentine said that he exited the vehicle and said, "Look this is it. Stop bothering the man."  Valentine said that he first saw the knife when Binienda tried to slash his neck but managed instead to cut him "from my left ear down to my jaw bone just under my chin."  Valentine denied that he was armed when Binienda cut him.  Roberts called 911 on his cell phone, and they met the police at a hospital.

Binienda testified that he had a meal at the Salvation Army on the day of the incident and denied that he hit Finkle, but he admitted that he pushed Finkle.  Binienda said that while talking on the phone, he felt something steel hit him in the back of the head and turned to see Valentine attacking him with brass knuckles; Valentine hit him two or three times with the brass knuckles.  Binienda claimed that Valentine had also assaulted him under a bridge about a week before.  An ambulance took Binienda to the hospital.

Constance Lamb testified that she was working in the emergency room at Mt. Clemens Regional Hospital when Binienda came in by ambulance with a bleeding two-inch laceration over his right eye.  She said that Binienda smelled of alcohol when he arrived and described him as upset and "verbally abrasive."  She said that security had to be called so she could examine the injury.  She also said that, at one point, Binienda stood up, went to a sink and mirror, pounded his fist while looking into the mirror, and said that "he was going to find the n----- that did this to him and slice him."

Binienda said that he left the hospital at 3:30 or 4:00 p.m., bought a beer, and went under a bridge to drink the beer.  According to Binienda, Valentine and Roberts lived under the bridge.  Binienda threw Roberts and Valentine's mattresses in the river and picked up Valentine's knife.  While under the bridge, Binienda "got a feeling" that Finkle and Valentine were looking for him, armed himself with Valentine's knife, and started walking home.  While Binienda walked home, Finkle, Valentine, and Roberts pulled up to him in a car, and Valentine got out and went after Binienda.  Binienda denied reaching into the vehicle and said he took out the knife, backed away, and said, "Look, man, I have a knife."  He said he could not run away because he was hurting too much from the earlier assault.  Valentine dove at Binienda and cut himself on the knife that Binienda was holding.

Macomb County Sheriff's Deputy Dan Durrani testified  that he found a knife near the alleged crime scene.  Another officer, Daniel Barbuela, testified that while looking for a white male in a brown leather jacket, he spotted Binienda near the crime scene, cuffed him, and placed him in the back of a patrol car.  Officer Barbuela said that Binienda was "highly aggravated" and "very irate[,]" that Binienda appeared intoxicated, and that he could smell intoxicants on Binienda's breath.  Officer Barbuela said that Binienda "kept swearing at [him]" during the entire time they were at the scene.  Binienda tried several times to kick out the driver's side window while in the patrol car and told Officer Barbuela that he was going to kick

him in the head when he got out of the car.  When asked if Binienda said anything about the person that he claimed had assaulted him, Officer Barbuela said that Binienda asked him, "What are we going to do about the n-----[?]"

*People v. Binienda*, No. 273485, 2008 WL 203650, at *1-2 (Mich. Ct. App. Jan. 24, 2008).

When the petitioner filed his direct appeal of right, his first appointed appellate counsel filed a motion to remand the case for an evidentiary hearing on the claim that the petitioner's trial counsel was ineffective when he failed to investigate and raise an insanity or voluntary intoxication defense. The state appellate court denied the motion.  Subsequently, the petitioner moved for substitute counsel, and the request was granted.  The petitioner's first counsel's brief was stricken, and substitute appellate counsel filed a brief that raised issues relating to the appointment of trial counsel and counsel's performance.  The petitioner filed a *pro se* brief of his own raising several other issues.

The state court of appeals affirmed, *Binienda*, 2008 WL 203650, and the Michigan Supreme Court denied leave to appeal. *People v. Binienda*, 482 Mich. 984, 755 N.W.2d 630 (2008).  The petitioner then filed his petition for a writ of habeas corpus in this Court raising the following issues:

I.      The petitioner was denied his right to the effective assistance of counsel.

II.     The petitioner was denied the right to a fair trial due to several instances of prosecutorial misconduct.

III.    The prosecution's use of testimonial hearsay denied the petitioner his right to confrontation.

IV.     The petitioner was denied his right to due process because he was denied a complete and accurate record for purposes of his appeal.

V.      The prosecutor committed misconduct by failing to disclose exculpatory evidence to the defense in violation of the law set forth in *Brady v. Maryland*.

VI.     The petitioner was not properly warned of his rights in violation of the standard set forth in *Miranda v. Arizona*.

-4-

VII.    The trial court erred in denying the petitioner's motion for substitute counsel.

VIII.   The petitioner was denied the effective assistance of counsel by his counsel miscommunicating the petitioner's version of the confrontation to the jury in his opening statement and by failing to argue self-defense in closing argument.

IX.     The prosecutor committed misconduct in his closing argument and rebuttal by using defense counsel's opening statement and closing argument as evidence against the petitioner and by arguing that defense counsel did not believe his own client.

The respondent filed an answer to the petition attacking the merits and contending that some of the claims were not preserved properly in the trial court.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Under that review standard, mere error by the state court does not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a

writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id*. at 409. The Court has explained that an unreasonable application of federal law is different from an incorrect application of federal law. Under that language, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The Supreme Court has continued to emphasize the limited nature of this review. In its recent unanimous decision in *Harrington v. Richter*, --- U.S. ---, 131 S. Ct. 770 (2011), the Court reiterated that the AEDPA requires federal habeas courts to review state court decisions with "deference and latitude," and "[a] state court's determination that a claim lacks merit precludes federal habeas relief

-6-

so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).   The Sixth Circuit observed recently that "[t]his is a very high standard, which the [Supreme] Court freely acknowledges." *Peak v. Webb*, 673 F.3d 465, 472 (6th Cir. 2012).   The *Peak* court suggested that *Richter* holds that the review standard "is even more constricted than AEDPA's plain language already suggests." *Ibid.*

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. The AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, --- U.S. ---, ---, 130 S. Ct. 1855, 1862 (2010) (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached" (internal quotation marks and citations omitted)); *see also Peak*, 673 F.3d at 473-74; *Bray v. Andrews*, 640 F.3d 731, 737-39 (6th Cir. 2011); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc).   Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, --- U.S. ---, 131 S. Ct. 1388, 1398 (2011).

A.

The petitioner's first and eighth claims assert that he was denied his right under the Sixth Amendment to the effective assistance of trial counsel. The state court of appeals discussed in detail each of the instances in which the petitioner alleged that his trial counsel's performance was substandard and found no constitutional violation. The respondent asserts that the state appellate court reasonably decided the claim.

The two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs the Court's analysis of ineffective-assistance-of-counsel claims. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "To establish ineffective assistance of counsel 'a defendant must show both deficient performance by counsel and prejudice.'" *Premo v. Moore*, --- U.S. ---, ---, 131 S. Ct. 733, 739 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).

Because of the high deference accorded state court determinations by AEDPA, establishing that counsel was ineffective and, therefore, the petitioner was denied his right to counsel under the Sixth Amendment is difficult. The Supreme Court explained recently:

> "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ---, ---, 130 S. Ct. 1473, 1485 (2010). . . . The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S. at 690.

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ---, 129 S. Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ---, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 131 S. Ct. at 788.

-8-

On habeas review, "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable — a substantially higher threshold.'" *Knowles*, 556 U.S. at 123 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Moreover, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Ibid.* (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

In his brief, the petitioner catalogs a litany of mistakes he thinks defense counsel made, all of which were rejected by the court of appeals. The state court's disposition of the claims reasonably applied controlling federal law.

### 1. Misstatements During Opening Statement

The petitioner argues that his lawyer failed to understand the significance of the police report generated by Officer C. Fraser that was used at trial, and therefore made a mistake describing it during opening statement. According to the testimony, Officer Fraser arrived outside the Salvation Army before the petitioner was transported to the hospital. The report indicates the petitioner told Fraser that he had been struck with a pipe by "Ron" under a bridge, but the petitioner otherwise was uncooperative with Fraser. Apparently based on this report, defense counsel in opening statement and during his cross-examination of Finkle referred to the victim as having struck the petitioner with a pipe during the altercation outside the Salvation Army.

During his own testimony, the petitioner explained that he had attempted to tell Fraser that the victim had assaulted him on a previous occasion with a pipe under the bridge, but he was disoriented after the attack. He testified that the victim was armed with brass knuckles on the date in question. The prosecutor used that discrepancy to suggest that the petitioner could not keep his story straight and to suggest that the petitioner misled Fraser because he planned to seek revenge.

-9-

The court of appeals noted that the petitioner's version of the events and Officer Fraser's version differed, but because the petitioner testified at trial the discrepancy would have come to light eventually, and therefore "there is no reasonable probability that defense counsel's statement made any difference." *People v. Binienda*, 2008 WL 203650, at *6.

The state court's assessment of the lack of prejudice was reasonable. The inconsistency would have been explored by the prosecutor during cross-examination of the petitioner no matter what trial counsel had done. The damaging feature of the statement to Fraser and the petitioner's conduct after the assault in front of the Salvation Army was not the difference in description of the victim's weapon but rather the petitioner's reaction and demeanor. The officer testified that the petitioner was angry and uncooperative and referred to his assailant as "Ron." Similarly, he was very combative at the hospital and specifically vowed to"slice" the "nigger" who attacked him. Accordingly, even if counsel had put forth the petitioner's explanation for the pipe reference during opening statement, it would have done little to impact the result of the trial. The prosecutor would still have been able to draw the same inference that the petitioner's conduct after the attack at the Salvation Army showed that he planned to attack the victim with a knife.

### 2. Failure To Argue Self-Defense During Closing Argument

The petitioner next asserts that his lawyer failed to support his request that the jury be instructed on the lesser offense of aggravated assault and to argue self-defense during closing argument. A review of the record shows that this lesser offense instruction was requested both before and after closing arguments. Defense counsel acknowledged that the requested instruction was not truly a lesser-included offense because it contained an element that the charged offense did not, but he asserted that under the facts of the case — where an injury actually was caused — the

-10-

requested instruction nevertheless was appropriate.  T 8/11/06, at 1-8, 25-27.  The trial court denied the request.  However, defense counsel did request a self-defense instruction, which was given.

The court of appeals found that defense counsel's argument tactics did not descend below professional norms, and no prejudice resulted because the jury was instructed properly and could have considered self-defense.  Those findings did not unreasonably apply *Strickland*.  The petitioner has not suggested a better rationale that his counsel could have advanced for the lesser offense instruction, or that there is a reasonable probability that the trial court would have ruled differently if a different argument in support of the instruction had been made.  Trial counsel did not perform deficiently in his efforts to seek an instruction on aggravated assault, and the petitioner has not shown a reasonable probability that a different approach to the request would have proven more successful.

The petitioner also complains that his trial counsel performed deficiently when he asserted in his opening statement that the petitioner acted in self-defense but then changed the theory of defense during his closing argument.  The record shows that defense counsel did in fact represent to the jury that the petitioner would claim self-defense.  And the petitioner testified on his own behalf that the victim approached him with brass knuckles before he dove towards him and his face landed on the knife.  Despite the opening statement and testimony by the petitioner, defense counsel did not present a claim of self-defense during closing argument.  Instead, he argued that the prosecutor had failed to establish the element of intent to commit great bodily harm.

The state appellate court found that this change in tactics was not professionally deficient. That conclusion was not objectively unreasonable.  The evidence presented at trial undermined the self-defense theory.  Multiple witnesses testified regarding the petitioner's angry and violent state after the Salvation Army confrontation.  He gave the police a false name for the person who

-11-

assaulted him and refused to cooperate with them.  He told a worker at the hospital that "he was going to find the nigger that did this to him and slice him."  He admitted that went to the area where he believed Finkle and Valentine stayed, threw their mattresses in the river, and took Valentine's knife.  And then after his arrest, the petitioner continued on his violent tirade by yelling and swearing at the officer and attempting to kick out the window of his squad car.

With this evidence, it was not unreasonable for defense counsel to alter his strategy and attack the prosecutor's case by challenging the specific-intent element.  The trial court instructed the jury that the prosecutor was required to prove that the petitioner intended to cause great bodily harm, which was defined as "physical injury that could seriously and permanently harm the health or function of the body."  Tr. Aug, 11, 2006 at 43.  The argument that the petitioner did not intend to cause great bodily harm was consistent with the petitioner's description of the incident, and it at least had the advantage of accounting for the evidence suggesting that the petitioner sought out Valentine to slice him.  Defense counsel suggested that even if the prosecutor showed that the petitioner did plan to seek revenge against Valentine, he did not intend to cause great bodily harm.  The state appellate court's decision applying the presumption of effective assistance under *Strickland* was not unreasonable because "'fairminded jurists could disagree' on the correctness of the state court's decision."  *Richter*, 131 S. Ct. at 786.

### 3. Failure To Investigate Or Call Witnesses

The petitioner next argues that his counsel failed to conduct adequate pre-trial investigation and failed to file discovery motions that resulted in the failure to call several witnesses at trial.  He identifies four uncalled witnesses: (1) the woman at the Salvation Army who called 9-1-1 and witnessed the victim's assault on the petitioner; (2) Tim Roberts, who witnessed all the confrontations between the petitioner and the victim; (3) the owner of a pawn shop who was

-12-

assaulted by the victim; and (4) the petitioner's cellmate, Lamont Arnold, who would have testified to the petitioner's peaceful character. He also alleges that if defense counsel had canvassed the residential street on which the incident occurred, he might have discovered witnesses who supported his self-defense claim.

The state appellate court rejected this claim in part because there was no record that defense counsel failed to interview the witnesses, or that the witnesses were available and would have testified favorably. In Michigan, the court of appeals may remand an appeal to the trial court to conduct an evidentiary hearing on a claim of ineffective assistance. *People v. Ginther*, 390 Mich. 436, 212 N.W.2d 922 (1973). However, a remand motion must be supported by an affidavit or offer of proof regarding the facts to be established at a hearing. Mich. Ct. R. 7.211(C)(1)(a). The petitioner's first appointed appellate attorney did file such a motion, but he did so only on the grounds that trial counsel was ineffective by failing to raise a voluntary intoxication or insanity defense. The motion briefly mentioned uncalled defense witnesses, but it does not appear that it was supported with an adequate offer of proof. The determination of whether a state court adjudication is reasonable is "limited to the record that was before the state court." *Pinholster*, 131 S. Ct. at 1398. There was little direct evidence of prejudice offered by the petitioner to the state courts; it was not unreasonable for the state court to conclude that the petitioner failed to carry his burden to prove prejudice from his trial counsel's alleged deficient failure to investigate.

The state court also concluded that none of the proposed witnesses were present at the time of the crime, so they could not support the petitioner's self-defense theory. And the court observed that calling the cellmate to testify as a character witness was rife with peril, since it would have opened the door to rebuttal evidence of the petitioner's character. Those decisions reasonably

-13-

applied the Sixth Amendment jurisprudence discussing the deference given to counsel's strategic choices.

### 4. Failure To File Pretrial Motions

The petitioner asserts that his trial counsel failed to move to suppress his statements under *Miranda v. Arizona*. Deputy Burbeula testified at trial regarding the petitioner's conduct and statements immediately after he was arrested:

> He was highly aggravated, appeared intoxicated. I could smell intoxicants coming from his breath. He stated that he didn't do anything. That he got jumped. And he was very irate and uncooperative upon my questioning. . . . He kept swearing at me. He said that he got jumped by the guys earlier in the day and I didn't do anything about it. And he kept telling me to fuck off, I wasn't helping him. And I tried to explain to him, I said, I got on at 4:00 o'clock. If this happened, you know, early in the day shift, it's not, it's not my fault. But he wouldn't listen to me. He was very irate. . . . On the way to the jail he kept calling me an asshole, telling me to fuck you, this and that. I tried to take his statement because, see if he wanted to pursue his side of the story and he wouldn't cooperate. He called me an asshole, fuck you. He would be hot and cold. I'm sorry, you know, I know you are doing your job, then go right back to swearing at me. . . . He, several times he tried to kick out the driver's side window. . . . He said something about going to be a problem when we get out of the car. He was going to kick me in the head. . . . When we were getting up onto the ramp of the booking garage he said: What are we going to do about the nigger.

Tr. 8/10/06, at 150-152.

The state appellate court found that the petitioner did not demonstrate that his statements were obtained in violation of *Miranda*, and therefore the failure to file a motion to suppress them was not evidence of deficient performance by defense counsel. That conclusion was not unreasonable.

The police may not question a person in custody unless they warn him of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). Statements given in response to questioning where no warnings were given must be excluded. *United States v. Cole*, 315 F.3d 633,

-14-

636 (6th Cir. 2003) (citing *Miranda*, 384 U.S. at 478–79). However, statements that are given freely and voluntarily not in response to questioning are not subject to *Miranda*'s exclusionary rule. *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) (holding that *Miranda* bars only those statements that result from "express questioning or its functional equivalent"). "'[V]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected' by the holding in *Miranda*." *United States v. Collins*, 683 F.3d 697, 703 (6th Cir. 2012) (quoting *Cole*, 315 F.3d at 636).

It was reasonable for the state appellate court to find that the petitioner's statements to the deputy were not the product of interrogation or its functional equivalent. The deputy's testimony indicates that he did not attempt to elicit any incriminating responses from the petitioner; instead, the officer's conversation was simply responsive to the petitioner's violent outbursts. Trial counsel was not ineffective by failing to file a motion to suppress the petitioner's statements.

### 5. Failure To Cross-Examine Witnesses

The petitioner asserts that his lawyer inadequately cross-examined the prosecution's witnesses. He states that a more thorough cross-examination of the police witnesses would have shown that Finkle and Valentine testified falsely about the exact location of the incident. He also argues that his lawyer should have questioned witnesses more thoroughly about the extent of the petitioner's injuries. Neither allegation has merit.

Although the petitioner asserts that the exact location of the incident would have shown that Finkle and Valentine sought out the petitioner and not the other way around, he does not suggest how cross-examination on this subject would have undermined their testimony or made any difference in the outcome of the case. The petitioner has appended a hand-drawn map of the area, and even it shows that the competing locations are situated on the same block. Furthermore, because

-15-

all accounts of the incident involve the occupants of Finkle's vehicle spotting the petitioner walking down the street in question, the minor discrepancy was inconsequential.

Likewise, the photograph of the petitioner's injury certainly displayed its relevant features. The prosecutor argued that the injury was inconsistent with the petitioner's testimony that he had been hit with brass knuckles, and the petitioner testified otherwise.  Further cross-examination would have done little to advance the petitioner's version.  The state appellate court's conclusion that the argument lacked merit reasonably applied *Strickland*.

### 6.  Other Claimed Errors

The petitioner included other allegations of deficient performance: that defense counsel "discredited himself" by arguing that Valentine did not realize that he was injured until someone pointed it out to him; that he failed to test the prosecution's case; that he did not notify the petitioner that there was some doubt about the trial court accepting the sentence agreement during an aborted guilty-plea attempt; and that he failed to object to prosecutorial misconduct.  The court of appeals rejected all of these contentions because they were not supported by the record.  This Court agrees.

After careful review of the record and the petitioner's filings, the Court finds that he has not demonstrated that the state court adjudication of his ineffective-assistance-of-counsel claim was contrary to or involved an unreasonable application of clearly established law.

### B.

The petitioner's second and ninth claims assert that the prosecutor committed various acts of misconduct that rendered his trial unfair.  The respondent asserts that the claim is barred from review by the petitioner's failure to object to the alleged instances of misconduct.  The petitioner asserts that his trial counsel was ineffective for failing to object to the misconduct.  This Court finds

-16-

that it is more efficient to reach the merits of the claim. *See Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997).

It is well established that prosecutors must "'refrain from improper methods calculated to produce a wrongful conviction.'" *United States v. Young*, 470 U.S. 1, 7 (1985) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). However, "[c]laims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Prosecutorial misconduct will form the basis for a new trial and habeas relief only if the alleged misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "To constitute a denial of due process, the misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *Byrd v. Collins*, 209 F.3d 486, 529-30 (6th Cir. 2000) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)). "The Court must examine 'the fairness of the trial, not the culpability of the prosecutor.'" *Pritchett*, 117 F.3d at 964 (quoting *Serra v. Michigan Dep't of Corrs.*, 4 F.3d 1348, 1355 (6th Cir. 1993)).

When assessing such a claim, the Court first considers whether the prosecutor's conduct or remarks were improper. *Slagle v. Bagley*, 457 F.3d 501, 515-16 (6th Cir. 2006). If they were, the Court then must decide whether the improper acts were so flagrant as to warrant relief. *Id.* at 516. The Sixth Circuit applies a four-factor test to any inappropriate prosecutorial conduct to determine whether it was flagrant: "(1) whether the evidence against the defendant was strong, (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally." *Id.* (citation omitted).

-17-

The petitioner identifies eight instances in which he believes the prosecutor committed misconduct.  The court of appeals addressed each in turn, and reasonably so.  It is useful to set forth that court's holdings:

(1) Witness Credibility

Binienda argues that the prosecutor engaged in misconduct by (1) implying that he should not be believed based on the inconsistency of his statements and (2) by vouching for the credibility of Finkle's and Valentine's testimony.  We disagree.

A prosecutor may not vouch for the credibility of a witness to the effect that he has special knowledge regarding the witness's testimony. *People v. Bahoda*, 448 Mich. 261, 276; 531 N.W.2d 659 (1995).  However, "[a] prosecutor may argue from the facts that a witness, including the defendant, is not worthy of belief, and is not required to state inferences and conclusions in the blandest possible terms." *People v. Launsbury*, 217 Mich. App. 358, 361; 551 N.W.2d 460 (1996) (citations omitted).

Although the prosecutor argued that Finkle and Valentine had been truthful and that Binienda was lying, the prosecutor never argued that he possessed special knowledge regarding any witnesses' credibility and based his argument regarding credibility solely on the evidence.  Accordingly, the prosecutor's comments regarding credibility did not amount to prosecutorial misconduct.

(2) Badgering Witness

Binienda argues that the prosecutor badgered him when the prosecutor used a police report of an alleged prior assault against Binienda to impeach him and asked Binienda if he could read.  Because the prosecutor made this comment in response to Binienda's claim that he told the police that Valentine assaulted him with brass knuckles a few hours before the alleged crime at issue, the comment was not improper.  Moreover, even assuming the question was improper, this isolated comment was not outcome determinative.  [*People v.*] *Watson*, [245 Mich. App. 572,] , 586[, 629 N.W.2d 230 (2005)].

(3) Use Of Hearsay Testimony

Binienda argues that the prosecutor engaged in misconduct by admitting the police report because it was hearsay and that his conviction should be reversed because it was supported by inadmissible hearsay.  However, the police report was not admitted as evidence but was used to impeach Binienda's testimony as a prior inconsistent statement and a party admission.  Mich. R. Evid. 801(d)(1), (2).  The other incident that Binienda argues constitutes inadmissible hearsay concerns use of the police report solely to refresh the recollection of an officer who was testifying, which is

-18-

also permissible. Mich. R. Evid. 803(5).  "[P]rosecutorial misconduct cannot be predicated on good-faith efforts to admit evidence."  *People v. Noble*, 238 Mich. App. 647, 660; 608 N.W.2d 123 (1999).

(4) Use Of Perjured Testimony

Binienda argues that the prosecutor introduced perjured testimony because Finkle and Valentine testified that the alleged crime occurred near Binienda's apartment, but police reports indicated that the crime occurred on a certain street corner. Binienda does not cite where the record would show that the location described in the police report is distinguishable from the area near Finkle's apartment.  This Court need not consider an allegation when an appellant fails to cite where the record would support it. *Mackle, supra* at 604 n.4.  Moreover, even if the police reports differed from the witnesses' testimony, such a discrepancy would effect the weight of the evidence and not its admissibility.

(5) Use Of Other Acts Evidence

Binienda argues that the prosecutor admitted other act evidence without proper notice in violation of Mich. R. Evid. 404(b) when he elicited testimony and admitted evidence that Binienda attempted to cut Finkle with a knife before assaulting Valentine. The evidence did not amount to other act evidence under Mich. Rule. Evid. 404(b) because it concerned Binienda's behavior during the crime at issue. "[W]here a witness has testified to a fact or transaction which, standing alone and entirely unconnected with anything which led to or brought it about, would appear in any degree unnatural or improbable in itself, without reference to the facts preceding and inducing the principal transaction, and which, if proved, would render it more natural and probable; *such* previous facts are not only admissible and relevant, but they constitute a necessary part of such principal transaction — a link in the chain of testimony, without which it would be impossible for the jury properly to appreciate the testimony in reference to such principal transaction."  *People v. DerMartzex*, 390 Mich. 410, 413-414; 213 N.W.2d 97 (1973), quoting *People v. Jenness*, 5 Mich. 305, 323-324 (1858) (emphasis by *DerMartzex*).

Here, the alleged assault on Finkle occurred just seconds before the assault at issue, and requiring exclusion of this evidence would have amounted to presenting the prosecution's case in a vacuum.

Binienda also argues that Finkle's hat, which was purportedly cut with a knife was published to the jury but "[t]his admission has been deleted from transcript to prevent review by this Court."  Binienda cites no reason why the hat should not have been shown to the jury beyond his argument that the evidence was inadmissible as prior-act evidence, which lacks merit for reasons already considered.  Binienda also provides this Court with no evidence to support his allegation.  Even assuming that the prosecutor somehow altered the transcripts, Binienda has failed to show that such

-19-

conduct would have been outcome determinative because the jury heard testimony that the hat was cut, and any alleged alteration of the transcripts would have occurred, if at all, after the trial.

(6) Use Of Expert Medical Testimony

Binienda argues that the prosecutor personally offered expert medical testimony when he argued during closing argument that Valentine's wound was an offensive wound.  "A prosecutor may not make a statement of fact to the jury that is unsupported by evidence, but she is free to argue the evidence and any reasonable inferences that may arise from the evidence." *People v. Ackerman*, 257 Mich. App. 434, 450; 669 N.W.2d 818 (2003).  Considering the prosecutor's comment in light of Binienda's testimony that Valentine cut himself on the knife when Binienda merely held it in front of him, the prosecutor's comment was a reasonable inference based on the evidence.

(7) Misrepresentation Of Record

Binienda argues that the prosecutor misrepresented the record when he argued that Binienda had been searching for Valentine, changed his story that Valentine hit him with a pipe and could not get his story straight, did not act in self-defense and did not retreat.  For reasons already considered, these arguments were reasonable assertions based on evidence and were not improper.

(8) Violation Of Attorney-Client Relationship

Binienda argues that the prosecutor intruded on the attorney-client relationship by meeting with Binienda before trial without his attorney and threatening and trying to intimidate him into taking a plea bargain.  Even assuming Binienda's allegations are correct, Binienda's statement to the judge at the start of trial regarding the issue demonstrates that the alleged incident occurred before trial.  Binienda does not explain how the incident before trial could have affected the outcome of the trial, so his argument lacks merit.

*Binienda*, 2008 WL 203650, *3-5.

The state appellate court's holding was not an unreasonable determination of the facts, or contrary to or an unreasonable application of Supreme Court precedent.  The petitioner's brief focuses on a subset of the allegations he raised in the state courts.  He chiefly complains that the prosecutor improperly used Fraser's police report.  The state appellate court determination that the report did not amount to inadmissible hearsay is not quite accurate.  The report itself was authored

-20-

by Officer C. Fraser, who memorialized the statements that petitioner made outside the Salvation Army location. The report, therefore, was not the petitioner's own statement, although it was used at trial as evidence of a prior inconsistent statement to impeach the petitioner's testimony. But the report was never received in evidence, and the prosecution's attempt to offer it was met with a hearsay objection by defense counsel, which was sustained. The prosecutor's questioning of the petitioner about what he told Fraser certainly is an allowable trial tactic, and showing the petitioner the report and asking to read it to himself was proper as well. The petitioner attempted to explain the discrepancies between his statements to Fraser and at trial by claiming that he was dazed at the time he made the statements and was referring to an earlier encounter. The prosecutor's argument that the petitioner was actually giving the police false information because he wanted to seek revenge on his own also was proper.

Next, contrary to the petitioner's characterization of the closing argument, the prosecutor did not vouch for the credibility of witnesses. A prosecutor is allowed to argue that the jury should arrive at a particular conclusion based upon the record evidence. *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir. 1999). The test for improper vouching for a witness is whether the jury reasonably could believe that the prosecutor was indicating a personal belief in the witness's credibility. *United States v. Causey*, 834 F. 2d 1277, 1283 (6th Cir. 1987). "Generally, improper vouching involves either blunt comments, or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *United States v. Francis,* 170 F.3d 546, 550 (6th Cir. 1999) (internal citations omitted). Here, the prosecutor stated that his impression of Valentine and Finkle's testimony was that it was truthful, but he did not suggest that his impression was based on any hidden knowledge The prosecutor's statements that he thought it "clear that the defendant is guilty" and that the victim's wound "is an

-21-

offensive wound" was qualified by his earlier statement, "[w]hen we look at this case." The argument was based on the evidence presented at trial and was not improper.

Lastly, the prosecutor did not knowingly offer perjured testimony by allowing Finkle and Valentine to testify that the encounter occurred down the street from where the petitioner claimed it occurred. To prevail on a claim that a conviction was obtained by evidence that the government knew or should have known to be false, a defendant must show that the statements were actually false, that the statements were material, and that the prosecutor knew they were false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998). A habeas petitioner must show that a witness's statement was "indisputably false," rather than misleading, to establish a claim of prosecutorial misconduct or a denial of due process based on the knowing use of false or perjured testimony. *Byrd*, 209 F.3d at 517-18.

Here, the petitioner has not shown that the prosecutor knew the testimony was false. There was conflicting testimony on the precise location of the incident. The location the petitioner gave for the assault appears to be the same location Finkle and Valentine said they first saw the petitioner walking. The location Finkle and Valentine gave for the assault is apparently a short distance away on the same city block. Nothing in the record shows that Finkle and Valentine's testimony on this point was indisputably false.

The state appellate court reasonably rejected this claim. Tthe petitioner has not demonstrated entitlement to habeas relief.

## C.

The petitioner's third claim asserts that his rights under the Confrontation Clause of the Sixth Amendment were violated by the admission of Fraser's police report without an opportunity to cross-examine Fraser. The state appellate court did not address this claim under the Confrontation

Clause, but during its discussion of the petitioner's prosecutorial misconduct claim, it found that the police report was not hearsay because it was only used to impeach the petitioner's testimony with his prior inconsistent statement and to refresh the recollection of another officer.

Out of court statements that are testimonial in nature are barred by the Sixth Amendment Confrontation Clause unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. *See Crawford v. Washington*, 541 U.S. 36, 68-69 (2004). However, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id*. at 59, n.9. The non-hearsay aspects of a testimonial statement raise no Confrontation Clause concerns. *Tennessee v. Street*, 471 U.S. 409, 414 (1985); *see also Adams v. Holland*, 168 F. App'x 17, 19-21 (6th Cir. 2005). Furthermore, the underlying question of what is or is not hearsay evidence in a state court trial is governed by state law. *See Johnson v. Renico*, 314 F. Supp. 2d 700, 705 (E.D. Mich. 2004).

Here, the Michigan Court of Appeals determined that the Fraser report was not admitted into evidence for the truth of the matters asserted in it, but that it was properly used under state evidentiary law to impeach the petitioner's testimony with his prior inconsistent statement and to allow another officer's recollection to be refreshed. As noted earlier, the report was not received into evidence; the trial court sustained the defense's hearsay objection when the prosecutor offered it in evidence. There is no suggestion that the report was used as substantive evidence, and the petitioner actually never denied making the prior statement to Officer Fraser. Fraser should have been called as a witness to testify that the petitioner actually made the prior statement, so that the petitioner could cross-examine him on whether the report accurately set out the fact of that statement. But Confrontation Clause errors are subject to a harmless error analysis. *Delaware v. Van Arsdale*, 475 U.S. 673, 684 (1986). Harmlessness is determined by assessing the following

-23-

factors: (1) the importance of the witness's testimony to the prosecution's case, (2) whether the testimony was cumulative, (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, (4) the extent of cross-examination otherwise permitted and (5) the overall strength of the prosecution's case. *Id.* at 684. Here, the petitioner's acknowledgment that he made the statement but was disoriented at the time establishes that the reference to the contents of Fraser's report would have had little effect on the outcome of the trial. The report itself did not deal with the actual assault. And the prosecution presented a strong case about the events that culminated in the slashing of Valentine.

The use of the police report did not cause a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted). The Court finds that the petitioner is not entitled to habeas relief on this claim.

<div align="center">D.</div>

The petitioner's fourth claim is that his right to appeal his conviction was denied by inaccuracies in the trial transcript. This claim was raised in the petitioner's motion for remand to correct the record on appeal, which was filed in and denied by the state appellate court.

There is no merit to the claim. A criminal defendant "'does not have a constitutional right to a totally accurate transcript of his criminal trial.'" *Carpenter v. Vaughn*, 296 F.3d 138, 155 (3d Cir. 2002) (quoting *Tedford v. Hepting*, 990 F.2d 745, 747 (3d Cir. 1993)). A defendant's constitutional rights are violated only if missing parts of the state record adversely affect the outcome of the criminal proceedings, such as by preventing or inhibiting meaningful review. *See Scott v. Elo*, 302 F.3d 598, 604-605 (6th Cir. 2002).

Here, even assuming the truth of petitioner's recollection of the proceedings, he has failed to show how the alleged inaccuracies adversely affected the outcome of his criminal trial. The

<div align="center">-24-</div>

allegedly incorrectly transcribed exchanges were inconsequential to any claims asserted by the petitioner on appeal.  The petitioner alleges that at one point the trial court chided defense counsel for being unprepared, but even if that occurred, the petitioner's ineffective assistance of counsel claim is without merit for the reasons discussed above.  Therefore, the alleged inaccuracies are not sufficient to entitle the petitioner to habeas relief.

<div align="center">E.</div>

In his fifth claim, the petitioner alleges that the prosecutor failed to disclose exculpatory evidence, referring to all the records generated with respect to the incident occurring at the Salvation Army.  The state court of appeals rejected the claim, writing:

> Binienda requests many documents that may not exist, and even requests a police report that Binienda was familiar with at trial and an ambulance report that he testified that he and his attorney or his attorney had a copy of.  Further, Binienda has not proven that any of the requested evidence would have been favorable to him or that he could not have obtained the documents himself with reasonable diligence.

> Binienda argues that the prosecutor should turn over the video of the trial proceeding because it would show Officer Amro altering a police report, which Binienda purportedly saw him do.  Binienda has not proven that the prosecutor possessed the evidence, that Binienda could not have obtained it, or that the evidence would have been favorable, and Binienda provides no evidence that would support this allegation.

*Binienda*, 2008 WL 203650, at *9.

That result reasonably applies *Brady* and the cases that follow it.  The Due Process Clause requires the state to disclose to the defense favorable evidence that is material to guilt or punishment.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S.

<div align="center">-25-</div>

263, 281-82 (1999).  The petitioner bears the burden of establishing each of those three elements. *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000).  A prosecutor has a duty to learn of favorable evidence in the possession of others acting on the state's behalf, including the police. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  Exculpatory evidence includes evidence that may be used to impeach the state's witnesses. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

In this case, at a pre-trial hearing on July 19, 2006, defense counsel requested that he be provided with any records regarding the incident that occurred between the petitioner, Valentine, and Finkle at the Salvation Army.  The prosecutor stated that he would turn over everything he had on the histories of his witnesses.  The prosecutor also indicated that he was not in possession of any reports about the prior incident and that he did not know if any existed.  Defense counsel stated that he did not know if any of the alleged reports would be material, but if they existed, he may be able to use them for impeachment.  The trial court ultimately decided that if defense counsel wanted to examine the reports of the incident, then he could request them himself, but also asked the prosecutor to provide any information he had to defense counsel if it may be beneficial.  The only records of the prior incident used at trial were the Fraser report and the picture of the petitioner's face.  It is difficult to imagine that any additional police reports beneficial to the defense would have been generated because the petitioner identified "Ron" as his assailant and otherwise refused to cooperate with the authorities or medical personnel.  In any event, the record demonstrates that the prosecutor agreed to provide anything to defense counsel that he had or that may assist him in locating the alleged police reports and statements from the earlier incident.

-26-

The petitioner has not identified any other reports of evidence that might have been material to his guilt.  And as the state court indicated, he has not shown how he has been prejudiced. This Court finds, therefore, that the decision by the Michigan Court of Appeals rejecting this claim was not unreasonable.

## F.

The petitioner's sixth claim asserts that his *Miranda* rights were violated.  As indicated above, however, the statements made by the petitioner to the officer transporting him after his arrest were not the product of a custodial interrogation and were spontaneous outbursts.  This claim is without merit.

## G.

Finally, the petitioner asserts in his seventh claim that the trial court erred in denying his request for substitute counsel.  The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  This constitutional right is applicable to the states through the Fourteenth Amendment. *Serra*, 4 F.3d at 1351 (citing *Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963)).  "A criminal defendant who desires and is financially able to retain his own counsel 'should be afforded a fair opportunity to secure counsel of his own choice.'"  *Ibid*. (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)).  However, "[t]he right to the assistance of counsel at trial does not guarantee that a criminal defendant will be represented by a particular attorney."  *Ibid.*; *see also Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989) ("Petitioner does not, nor could it defensibly do so, assert that impecunious defendants have a Sixth Amendment right to choose their counsel. The Amendment guarantees defendants in criminal cases the right to adequate representation, but

-27-

those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts.").

"A motion for new appointed counsel based upon defendant's dissatisfaction with his counsel previously appointed is addressed to the sound discretion of the trial court." *United States v. White*, 451 F.2d 1225, 1226 (6th Cir. 1971). The Sixth Circuit cites four factors to consider when assessing a trial court's exercise of discretion in denying a continuation of trial to obtain new counsel: "(1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice." *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001).

The Michigan Court of Appeals ruled that the trial court did not abuse its discretion in denying the petitioner's request for substitute counsel, stating:

> Although Binienda recites the procedural history of the proceedings below, he does not argue or explain how the trial court erred in denying his request to replace appointed counsel. Therefore, this argument is abandoned. *People v. Mackle*, 241 Mich. App. 583, 604 n.4; 617 N.W.2d 339 (2000) ("A party may not merely state a position and then leave it to this Court to discover and rationalize the basis for the claim.).
>
> Nevertheless, we conclude that Binienda's expressions of dissatisfaction with how defense counsel was handling his case did not adequately demonstrate a breakdown in the attorney-client relationship to warrant substitution of counsel. Moreover, as will be discussed below, good cause was not supported by Binienda's allegations that defense counsel was ineffective. Therefore, we conclude that the trial court did not abuse its discretion in denying Binienda's request for substituted counsel.

*Binienda*, 2008 WL 203650, *3.

This decision is neither contrary to nor an unreasonable application of Supreme Court precedent. Although the petitioner expressed dissatisfaction with defense counsel prior to trial, the

record does not indicate that any differences between the petitioner and counsel were so great that they resulted in a breakdown in communication or the inability to prepare and present an adequate defense.  The state courts reasonably determined that there was no basis for the substitution of counsel one month before trial. The petitioner is not entitled to habeas relief resulting from the continued representation of his appointed counsel.

### III.

The state courts' decisions in this case were not contrary to federal law, did not unreasonably apply federal law, and did not amount to an unreasonable determination of the facts.  The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   July 31, 2012

<div style="border:1px solid">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 31, 2012.

s/Deborah R. Tofil
DEBORAH R. TOFIL

</div>